1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - - X          2:25-CR-0004
UNITED STATES OF AMERICA,
                    Plaintiff
          Vs.                          Fort Myers, Florida
DERICK DESIR,
                    Defendant          November 14, 2025
- - - - - - - - - - - - - - X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE KYLE C. DUDEK
UNITED STATES DISTRICT JUDGE

UNITED STATES ATTORNEY'S OFFICE
BY: SIMON ETH, ESQ.
2110 First Street
Suite 3-137
Fort Myers, Florida 33901
Appearing for the Plaintiff

FEDERAL PUBLIC DEFENDER'S OFFICE
BY: ELLIS SUMMERS, ESQ.
2075 West First Street
Suite 300
Fort Myers, Florida 33901
Appearing for the Defendant

COURT REPORTER:Brandi A. Wilkins
        scalisba@gmail.com
        Fort Myers Federal Building
        2110 First Street
        Fort Myers, Florida 33901

2

THE COURT:  All right.  Good morning, everyone.  Please be seated.  To get us started, I'll have Ms. Ward call the case and then have counsel enter their appearances beginning with the Government and also have Ms. Ward swear in the defendant.  Ms. Ward?

THE CLERK:  Calling case 2:25-CR-4, United States of America versus Derick Desir.

MR. ETH:  Good morning, Your Honor.  Simon Eth appearing on behalf of the United States.

MR. SUMMERS:  And Good morning, Your Honor.  Ellis Summers on behalf of Derek Desir.

THE COURT:  Good morning, Mr. Desir.

THE CLERK:  Mr. Desir, can you please stand and raise your right hand?

D E R I C K  D E S I R, after having been duly called and sworn, testified as follows:

THE CLERK:  Thank you.

THE COURT:  All right.  Mr. Desir, back in July, you entered a guilty plea to Counts 5, 9, 10, 11 and 14 of a superseding indictment in this case which charged you with conspiracy to commit an offense against the United States, and in Counts 9, 10, 11 and 14 with making a false statement and a record required by a licensed firearm dealer.

3

Now, the Court has accepted your guilty plea and adjudicated you guilty of those offenses.  We are now here for your sentencing.  At this stage, it is my responsible to determine a sentence considering the offenses as well as all of the matters that were brought to my attention in the presentence report prepared by the Probation Office.

Let me start there with the presentence report.  Mr. Summers, did your client have an opportunity to read and review it?

MR. SUMMERS:  Yes.  He did, Your Honor.

THE COURT:  All right.  Mr. Desir, have you seen the presentence report that I mentioned?

THE DEFENDANT:  Yes, I have.

THE COURT:  Did you have a chance to review it?

THE DEFENDANT:  Yes, I have.

THE COURT:  Has your attorney answered all of your questions about the report?

THE DEFENDANT:  Yes.

THE COURT:  All right.  I know there are some objections to the report, so I'm going to turn to those now.  Let me first start -- sorry -- start with the factual recitation in the presentence report.  Mr. Summers, is there any objection to any of the facts in

4

there?

MR. SUMMERS:  No, Your Honor.

THE COURT:  All right.  Does the Government have any objections to the factual recitations?

MR. ETH:  Your Honor, it has one.  I'll say it's a correction, and it just will clarify some matters.  I spoke about it with Mr. Summers prior to the hearing and to the Probation Officer.

THE COURT:  Okay.  Which paragraph?

MR. ETH:  In paragraph number 29, it refers to the number of firearms that were purchased by Mr. Desir and his coconspirator during and in furtherance of the charged conspiracy that were recovered in Canada.

THE COURT:  Uh-huh.

MR. ETH:  The number that is given, 17, actually refers to a combined volume from a transport of firearms that predated the charged conspiracy.

THE COURT:  Okay.

MR. ETH:  As well as the firearms that were within the charged conspiracy.  If Your Honor recalls from the PSR, Mr. Desir was -- accompanied somebody, his coconspirator named Osnyson Desrosiers up for an initial delivery of firearms to Upstate New York, but Mr. Desir did not straw purchase any of those

5

firearms, so that predated the charged conspiracy.

THE COURT:  Okay.

MR. ETH:  Some of those firearms are included in that final number.  To be accurate, even though it doesn't have anything to do with the guideline calculation, to be accurate, the number of firearms that were actually found and recovered in Canada during various Canadian law enforcement investigations is 11 Glock firearms from the 35 that were collectively purchased during the conspiracy charge.

THE COURT:  Okay.  So paragraph 29 then should more accurately reflect the record and say at least 11 Glock firearms.  Correct?

MR. ETH:  That's correct, Your Honor.  As it is written, if that conspiracy language is included, that's correct.

THE COURT:  All right.  Mr. Summers, is there any objection to that?

MR. SUMMERS:  No.  We have no objection.

THE COURT:  And I -- I don't believe that impacts the guidelines in any way.

MR. ETH:  It does not.

THE COURT:  I was going to say, do you have any contention otherwise, Mr. Summers?

6

MR. SUMMERS:  No.

THE COURT:  Okay.  All right.  So I'll go ahead and accept the factual recitation of the presentence report.  Now, I do note there are some objections to the guidelines calculation.  So why don't I hear those now.  Mr. Summers?

MR. SUMMERS:  Yes, Your Honor.  May I approach the podium?

THE COURT:  Of course.

MR. SUMMERS:  Your Honor, we have the one objection essentially to what I guess would be called trafficking enhancement.

THE COURT:  Uh-huh, and that's a 2K2.1D5.  Correct?

MR. SUMMERS:  That's correct, Your Honor.

THE COURT:  Just a point of clarification, this took me a while to figure out, that is based upon the 2021 guidelines; right?

MR. SUMMERS:  That's correct.

THE COURT:  So that's what you are going to be arguing about today?

MR. SUMMERS:  That's correct, Your Honor.

THE COURT:  All right.  Just to make sure we're on the same page.

MR. SUMMERS:  Yeah.  I was on the wrong

7

page, and I created confusion. So I apologize for that, but yeah, it is the 25021 book.

THE COURT: Okay.

MR. SUMMERS: It is the trafficking enhancement from that book. Speaking to Mr. Eth about it before Court today, looking at the application note defining the trafficking, it is essentially the same as the most recent book. It's sort of they took the language and put it right in the guidelines instead of having it in the application note.

So it's -- it's essentially the same language that we have an issue with, and specifically, that has to do with whether Mr. Desir had any knowledge of who was receiving the firearms or that the receiving party intended to use or dispose of those firearms unlawfully.

Specifically, Mr. Desrosiers -- and we'll speak to this later at a later part of the sentencing, but Mr. Desrosiers is essentially the mastermind of this conspiracy. He's the person -- I think this is uncontested in the facts and PSR, he is the person who had the contact. He's the person that originally started the straw purchasing.

It is correct Mr. Desir went up to New York in April, but Mr. Desrosiers is the one who has all of

8

those contacts.  Mr. Desir did not.  Mr. Desir was not -- certainly not part of the taking of any of the guns to Canada itself.  And so Mr. Desir had no knowledge of what the receiving party intended to use the gun for or how to dispose of the firearm, whether that was unlawful or not.

Certainly he doesn't know the laws of Canada, but most importantly, he had no knowledge of how those guns were going to be used or disposed of. I know that the Government has provided the Asante case which I think is really a good instructive case. In particular, I think what sort of struck me is just pulling some of the language from the Asante case to let the Court know where I'm pulling from.

THE COURT:  Uh-huh.

MR. SUMMERS:  Looking at Page 644 the second paragraph under little D, the trafficking enhancement can apply to circumstances known to the defendant when he transferred the firearms or received the firearms in the intent to transfer them.  Establish the defendant knew or had reason to believe that his conduct resulted in the transfer of a firearm to someone who intended to use or dispose of the firearm unlawfully.

And what's sort of instructed from all of

9

the cases cited and from the Asante facts is that like each one of those cases they involve some kind of, you know, clear evidence of sereptous methods or smuggling, something that the defendant who is being hit with the enhancement is aware of.

So in US v Hernandez, in that case, they only knew the guy's name was Joe. They paid him to purchase -- the defendant was getting hit with the enhancement. He paid them to buy six firearms. They then hid the firearms in the panels of the door.

So it was very clear that -- that this was a situation where they're doing something illegal because otherwise they wouldn't have put them in the panels of the door. U.S. v West was very similar, another case cited in Asante, and that one West commented that something would have to be done with the serial numbers, IE, you know --

THE COURT: File them off.

MR. SUMMERS: -- file them off so the next person who is doing it illegally wouldn't be traced. In Asante, the guns were hidden in the car and then they were shipped to Jamaica. So and Asante knew that so he was aware that, you know, they were being smuggled.

I'm not aware that Mr. Desir had any

10

knowledge of how, and Mr. Eth may have more knowledge than I do, but Mr. Desir knew that they were being smuggled into Canada or that Mr. Desir knew who was receiving it and that it would be unlawful for them to receive it.

The reality is that Mr. Desrosiers is the person who had all of those contacts.  Mr. Desrosiers is the one who set all of these things up.  Mr. Desir's role was a lesser role.  He was not the person who had all of the communications.  He's not the person who knew everything that was going on.

He's not even the person who bought all of the guns in the initial time that he went to Upstate New York.  He bought some obviously later, but he didn't do it the first time.  His role was just way smaller than Mr. Desrosiers.  I'm not aware of knowledge that shows that he had any knowledge.

THE COURT:  Let me ask.  What about the facts of, I guess, the purchase, the transportation of essentially taking them anywhere and getting them to someone and then the defendant, your client, admitted that he was operating as a straw purchaser.

So all of those facts are kind of similar to the case law the Government cited.  Isn't that enough for me to find that he knew that he at minimum

11

smuggled them into Canada.  Maybe he doesn't know what they're going to do with them afterwards.

MR. SUMMERS:  Well, I'm not sure, and Mr. Eth might have information that I don't know.  He's certainly involved in taking the guns up to Upstate New York.  I'm not sure that Mr. Desir knew about the smuggling process because Mr. Desrosiers is the one who set all of that up.  So I'm not aware of any evidence at this point, but, you know, like --

THE COURT:  Well, what do I need?  Do I need an affidavit from him saying that I knew that they were being smuggled?  The facts are he straw purchased them, drove them up to the New York border and Canada and gave them to someone else.  I don't know what else you could infer from that course of conduct.

MR. SUMMERS:  Well, I guess I hear what the Court's saying, but these other cases, there's always evidence that's a little bit more --

THE COURT:  It's a little bit more, I agree with you.

MR. SUMMERS:  Yeah.  I know what the Court is saying, and I hear the Court, but there's sort of that next step, and I think that's where -- and I'll talk about this later.  Like we haven't -- we haven't gone for like a minimal or minor role in this case,

12

and I'll go through why.

There's a lot of things that are kind of sort of similar like we're kind of getting close to it, but he didn't -- we didn't really quite get there, but Mr. Desrosiers's role is much more significant here because he's the one who is organizing everything, and again, I'm not aware, and Mr. Eth may have --

THE COURT:  I hope he does because that's the burden.  So.

MR. SUMMERS:  I'm not aware that Mr. Desir was intimately involved in the smuggling process such that he would know the guns were hidden in the door or the guns were somehow otherwise concealed in the car, you know, making it apparent to him that they were smuggling them into Canada because, I mean, at the end, of the day, like people do this all the time and obviously what he's doing is illegal, but, you know, you can buy cigarettes and go sell them somewhere else and make a profit, and that doesn't mean that you know that that other individual is going to do something illegal with those cigarettes or whatever the product is that you are trying to do with.  And so that's the one --

THE COURT:  Let me ask you this.  The one

13

problem I have is I get it that if he just gave them to someone kind of you don't know what's going to happen to those firearms, but he got all the way to the border and then isn't -- isn't it enough that the person smuggles them into Canada?  Doesn't that mean he's using them illegally?

MR. SUMMERS:  And I think if -- that's the one element that I have not seen the evidence on.  Mr. Desrosiers is the one who is setting that part up, and the question is what is Mr. Desir's knowledge?  Does he know all about the smuggling process or is he just the guy who is helping him travel up there and Mr. Desrosiers who has got a much bigger role and is the person handling that part of the operation.

THE COURT:  So I guess then your ultimate argument boils down to there's not enough evidence that he knew someone intended to use or dispose of the firearms unlawfully.

MR. SUMMERS:  That's exactly it.

THE COURT:  All right.  I got it.  Mr. Eth?

MR. ETH:  Yes, Your Honor.

THE COURT:  If you are aware of --

MR. ETH:  Sure.  A couple points here.  I think that everything that the Court needs is in the PSR, and I actually don't think we have a lot of

14

dispute about the facts.

THE COURT:  Well, we don't have dispute about the facts because he agreed to them.  So just point me to the paragraphs where I can --

MR. ETH:  So I think there's two things to tell the Court beforehand.  I think that I heard in the argument and in the citation in the -- or in Mr. Summers' objection, you know, it's really not about the knowledge.  It's actually not the mens Rae that's required in this guideline.

It's reason to believe.  That is a lower standard.  I would argue a much lower standard than knowledge and that is critical here because if we're talking about knowledge we might be engaging in another analysis.  There are guidelines that required the mens Rae of knowledge.

In the drug guidelines, if you are knowingly misrepresenting a substance that's fentanyl, that's a huge increase because you know.  Here it's less than knowledge.  It's reason to believe, and Asante discusses that, and that's why we are maybe talking about a different standard here because if you look at Asante, and again, no two cases are exactly alike so the facts might be different, but Asante says critically applying a trafficking enhancement in this

15

matter, the Court looks not to what actually happened to the firearms but instead to the circumstances known to the defendant, and they can apply in circumstances when the defendant has some -- has a reason to believe and that the Court can reasonably infer that, you know, from the circumstances of the case that somebody would have a reason to believe.

So under that much lower standard than knowledge, what -- what were the facts that were known to Desir because that's critical. What did he know? And again, it's not unusual in more sophisticated criminal endeavors for a division of labor to be siloed, and I don't know that he had any idea of exactly who was getting these or what method they would use to smuggle them into Canada because that's part of sophisticated trafficking conspiracies.

You don't have one person do all the work because one person gets taken out and there goes your entire enterprise. So I'll give Mr. Desir the fact that maybe he didn't know the name of that person and he didn't know exactly how they were going to bring that into Canada intentionally so. What did he know?

Well, first of all, he knew that these were being given to people or being given to somebody on the Canadian border because he was there, and that's

16

critical too because that's another fact that's very, very important. When he enters the conspiracy, he already knows where the guns are going and he already knows how they were delivered initially, and he already knows Mr. Desrosiers is running the play again. So he knows where these are going.

You're talking about a situation, and if you look at the text messages, you are talking about somebody who knows that his coconspirator is getting paid tens of thousands of dollars, okay? We're not talking about $500. We're not talking about $1,000. We're talking about $30,000 here, okay? A $30,000 pay day for Mr. Desrosiers.

Second, he knows that he's straw purchasing the guns, that the entire endeavor of obtaining what he is bringing to Canada is illegal. He has to lie to get a dozen firearms, and his coconspirator has to lie to get a bunch more, a total of 35. So he has to lie a number of times, and the method that he's buying the guns, as you can see, he's not going to one place and buying 12 guns.

He's buying two, he's buying two, he's buying two, over the course of several days, and that is something that is a reasonable inference aside from the fact he knew he was lying, he's not trying to draw

17

particular attention to himself at one location.  He's going to a number of different locations over a number of different days to purchase firearms.

There's nothing in the law that would require him or say you have a maximum number of guns you can buy.  He could have walked in to Shoot Straight and bought all 12 guns, but he didn't, and there are reasons why somebody as the Court can reasonably infer from the evidence when they know something fishy is going on with these guns why they wouldn't choose to do that.

So we're talking about tens of thousands of dollars.  We're talking about straw purchasing a dozen firearms by Mr. Desir over a very short period of time.  Moreover, they're the same kinds of guns.  All right?  I mean, it doesn't take a rocket scientist to know this isn't going to a gun collector.  A gun collector isn't getting the same Glock handguns that are, you know, garden variety Glock handguns that there's nothing special about them including multiple of the same type of firearm.

Third, that they have to drive 1,000 miles with these guns?  Well, why?  Why are you buying guns in Florida and then driving them 1,000 miles to the Canadian border.  Okay?  That also -- again, these are

18

red flags.  What does somebody have a reason to know.  Does somebody have a reason to know that if they are buying guns, lying to buy them, getting paid a ton of money and driving them in a car 1,000 miles a way to drop them off with somebody?

These are all circumstances that the Court can make a reasonably inference on, and then they're handing them off to somebody.  Yeah, he doesn't know.  That's the whole point.  You are bringing 35 guns to the Canadian border and handing them to somebody you don't know.  There are inferences here and the Court also knows that he knew they were going to Canada.  He admitted that.

So he knows he's giving them to somebody in the U.S.  He knows those guns are destined for Canada.  The Court hit the nail on the head.  It's not just who is getting these in Canada.  It's who is getting these in the U.S. and what are they doing with them.  There's multiple layers why Mr. Desir had a reason to believe that these guns were going to be used unlawfully or given to somebody to use unlawfully.

Number one, the person who is actually getting those guns, there's a reason to believe from all of these circumstances they are not a lawful exporter.  It would make no sense, and so that person

19

to get them into Canada, again, does he know exactly how it's happening?  No.  That's kind of the whole point here.  He had a reason to believe those would be unlawfully smuggled into Canada, and he does not have to understand Canadian law or United States law that you can't just walk across the border with dozens of firearms.  That's number one.

And then who is getting them in Canada, and that kind of brings up more of the -- of the case involving Asante, and actually in some ways, you could argue the Asante case the circumstances here is even worse than the defendant in Asante.  In the Asante cases, the actually conspirators were involved in the export.

Here, he's passing them off to somebody who is involved in the export.  So there's another layer of somebody else who is committing a crime here who he is giving the guns to or the guns are being disposed to that don't seem to be the case in the Asante line, right, where they are personally engaged in the export activity.  So they're not giving them to somebody who is engaging in the export activity.  The conspirators are engaging in the export activity.

So here, you have two layers of crime.  You have Mr. Desir and Desrosiers driving up and handing

20

it to somebody.  That person in the Court -- Your Honor said the red flags are so abundant that even on a willful ignorance you could probably get there, but it's substantially lower.  It's reason to believe.

That you have reason to believe that person is going to unlawfully smuggle them and then the whole notion of that method of having to deliver firearms to random people in Canada, what do you think those people are doing with the firearms?  Why are Earth would somebody who wants to lawfully purchase a firearm in Canada buy one in whatever method these are coming across the border?  It makes no sense.

These are hallmarks of gun deliveries to people who there's a reason why they can't buy a firearm, and again, it's a reason to believe.  These are not methods of delivering firearms where you believe that the end user is going to be using this for home protection.

THE COURT:  So I guess your point is all of the circumstances about the straw purchase, the disparity and the money exchange, the length of the travel meaning someone on the border, those facts come to the conclusion that he -- I want to make sure I use the right language here, hold on -- that he knew or had reason to believe that that conduct would result

21

in the transport of transportation or disposal of firearms who intended to use or export the firearms unlawfully.  So in other words, based upon all those facts, he had reason to believe that that person was going to smuggle it into Canada.

MR. ETH:  Of course.  He would have reason to believe that, and exactly, this is all coming from the PSR.  Paragraph 23, 24, 25 through 27 lay out all of these facts.

THE COURT:  That's what I was --

MR. ETH:  Those facts are directly from the PSR.

THE COURT:  Okay.

MR. ETH:  I didn't rely on a single fact that's outside of the PSR.  The text message about the money is in the PSR.  The first hand off is in the PSR, the dates the guns were purchased are in the PSR, the different FFLs.  Every fact that I proffered to the Court is directly from the PSR and I made sure of that.

And again, looking at the Asante case, it's instructive some of the quotes that they quote the Luna case where it talks about the method of acquisition in delivery of firearms eliminated any plausible belief for the defendant that the firearms

22

would be used for innocent or legal purposes.  And what plausible belief could Mr. Desir have the method of acquisition that the myriad of felonies he had to commie to actually illegally purchase these guns, the delivery, the money, the hand off eliminates any plausible belief from Mr. Desir that these guns would have been used for innocent purposes.

THE COURT:  All right.  Mr. Summers?

MR. SUMMERS:  Thank you, Your Honor.  I think the Court probably has the facts, but I just wanted to quickly just because it -- I know that it's a lot being said and sometimes it gets confusing, but paragraph 24 makes it clear Mr. Desir had not straw purchased any guns prior to the end of April 2022.

He was merely involved in the transporting part of the operation.  That was literally all he did. He did not set-up the transaction.  He did not receive money from the transaction.  He did not engage whoever this was to smuggle across the border.  He did none of that.  That was Mr. Desrosiers.  Mr. Desrosiers did all of the straw purchasing.

So at the point in time when he went up with him and transported these guns in April, that's all we know that he had knowledge of was that he drove up there with him and transported these guns.  He did not

23

do any of the straw purchasing at that point in time. Now, obviously, paragraph 25 and paragraph 26 --

THE COURT:  Yeah.  It says that now we're going -- he's going to pay me 30 gun to run play again.

MR. SUMMERS:  Yeah.

THE COURT:  I need help buying.  So he then -- Mr. Desir does the straw purchasing.

MR. SUMMERS:  Correct.  That's when he does the straw purchasing, and actually, he doesn't even go up to New York on the second transaction.  That's just Mr. Desrosiers who transports them.

But with respect to the first time where he actually goes to New York, he's not involved in hardly anything.  He didn't do any of the illegal purchases. He's not aware of any of that information.  All he is doing is driving up there with Mr. Desrosiers.  All the other information is Mr. Desrosiers.

Then as we know from the text message, Mr. Desrosiers gives him the instructions that we're going to do this again, but this basically at this point in time he needs help doing the straw purchasing, and that's when he's involved in the straw purchasing, but it's very apparent how limited Mr. Desir's knowledge is here.

24

And he's not involved in the straw purchasing for the first transaction.  The second time he is.  Mr. Desir the second time doesn't go up to upstate New York.  There is no information in here that in any way says that Mr. Desir really has any contact with the smugglers.  I think the word was he siloed off from that part of the operation.

THE COURT:  I know, but I guess what I'm struggling with and I get if it was that he had to know, but what about the fact that the mens Rae is knew or had reason to believe?  What other logical conclusion that I can come to based upon the facts that he thought was going to happen to those guns?

I mean, he knew that they were -- even though he didn't do any of the scratch purchasing, he knew that his coconspirator took the guns, went up to Canada, gave them to a guy and smuggled them into Canada.  Then his coconspirator says hey, I'm going to do that again but I need you to help me straw buy them this time.  So he goes out and does it, gives the guns to his coconspirator and then does the same thing which is still --

MR. SUMMERS:  And I guess the one thing I think we're like maybe we're slightly different on the facts is the question of whether Mr. Desir knows that

25

they're smuggled into Canada.  Like yes, he takes them up there, he's part of that process.

THE COURT:  I get that -- I think it's arguable as to whether he knew, but the question is did he have reason to believe.  What other conclusion can I come to?  And the Eleventh Circuit case law in the Asante case specifically talks of that as to what other logical conclusion can you come to.  And it's -- so anything further, Mr. Summers?

MR. SUMMERS:  No.  I hear what the Court's coming from.  Thank you.

THE COURT:  All right.  I'm going to go ahead and overrule the objection.  I understand your concern, Mr. Summers, about the knowledge, the standard from the 2001 guidelines and the notes is that the defendant knew or had reason to believe that such conduct would result in the transport that the disposal of the firearms to an individual who intended to use or dispose of the firearm unlawfully.

Given the facts outlined by the Government and contained in paragraphs of the PSR, paragraphs 23 through 31, I find that even if the defendant did not know, he certainly had reason to know the firearms were going to be smuggled into Canada.  That's sufficient to apply the enhancement here.  So I'm

going to go ahead and overrule the objection and apply the enhancement.  Are there any other objections besides that one, Mr. Summers?

MR. SUMMERS:  No.  That was our only objection, Your Honor.

THE COURT:  Okay.  I thought there was some factual objections that you had I saw in paragraph 57.  Were those worked out?

PROBATION:  Your Honor, I believe the factual objections have been fixed.

THE COURT:  Oh, okay.  I'm sorry.

MR. SUMMERS:  Yeah, Your Honor.  We had one other prior objection, but Mr. Stevens is correct it has been resolved.

THE COURT:  Okay.

MR. SUMMERS:  Essentially what it is really quickly, there had been a statement that he had been convicted of another offense.

THE COURT:  In Canada, yup.

MR. SUMMERS:  And what we said was no, he hadn't been convicted.  There were two charges.  One he had been convicted of and one he had not, and then Mr. Stevens put in there he denied being convicted of that charge.  I'm not aware that there's any evidence that he's ever been convicted of a possession offense

27

in Canada, so that factual objection has essentially been resolved.

THE COURT:  All right.  So after overruling the objection, that results -- and accepting the facts provided by the parties, that results in a guidelines calculation of the total offense level of 23, criminal history category of 1 with -- is it zero?

MR. SUMMERS:  No.  It is one, Your Honor.

THE COURT:  Oh.  I thought -- thank you, Mr. Summers.  Criminal history category of one and the calculation is 46 to 57 months imprisonment, one to 3 years on each count of supervised release, restitution not applicable and a $20,000 to $200,000 fine and $500 special assessment.

All right.  Given those guidelines calculations, I'll now hear from the parties on an appropriate sentence.  Mr. Summers, is there any argument you would like to present?

MR. SUMMERS:  Yes, Your Honor.

Your Honor, we did file a sentencing memorandum I'll touch on briefly.  I don't want to beat that one to death.

THE COURT:  I got it and read it.

MR. SUMMERS:  Thank you, Your Honor.  I did have one thing I wanted to present, and this is

28

actually after Mr. Desir had done some research on this. There were two interesting cases that the DOJ had relatively recently published on convictions for the same offense. And so if I may.

THE COURT: You may approach, yes.

MR. SUMMERS: I provided copies to the Government. I generally speaking don't like to sort of try and compare cases because the facts are always different, and speaking, you know, with Mr. Eth, he correctly pointed out and I agree I can't tell from the press release, you know, if the two defendants cooperated. I mean, that definitely makes a difference, but they're both very interesting cases, and I certainly understand why Mr. Desir found them interesting.

The one out of Seattle area, Mr. Cooper. That individual trafficked 130 firearms -- 133 firearms. 54 of the guns had been recovered from crime scenes. I think DOJ cites him as the largest straw purchaser in the history of Washington, and this is an individual who is clearly purchasing guns and they are very quickly being used to commit crimes.

In this particular case, Mr. Cooper received a sentence of 36 months which in that case obviously the Court found it to be sufficient but not greater

29

than necessary.  As I said, it's always tough to sort of compare cases because there are facts that are different and we understand that, like there's no foreign country involved over the course of a four level enhancement.

There is the potential for cooperation.  I understand that, but this is an individual who trafficked a lot more firearms than Mr. Desir and whose role was much more significant I would gather than Mr. Desir, and his sentence was three years.  The other one is a Middle District of Florida case.

THE COURT:  The police officer; right?

MR. SUMMERS:  Yes.  A police officer, Mr. Nieto.

THE COURT:  What was that sentence?

MR. SUMMERS:  He also received three years, Your Honor.

THE COURT:  So 36 months?

MR. SUMMERS:  Yes, and that case involved 58 firearms, so really a significant amount of firearms. They're supplying them to a key member of criminal conspiracy who was then smuggling the guns to Dominican Republic, Puerto Rico and Haiti.  So in that way, it was kind of similar.

Once again, I understand that there's

30

probably a good chance this police officer did cooperate and there is probably a good chance that's part of it.  So it's always impossible to say the facts are the same.  I completely understand that, but that's also individuals using sensitive police data bases to provide information to this guy who is a criminal conspiracy.  So I mean, that's a peril fact, but he received three years as well.

So I do think as far as fashioning a sentence that's sufficient but not greater than necessary in trying to avoid unwanted disparities, you know, there are valuable cases as far as what some other Courts are doing in the country, sort of really in both cases cases involving more guns.

The other thing I wanted to sort of talk a little bit about, I touched on it just briefly in our sentencing memorandum, is sort of the role of Mr. Desrosiers and Mr. Desir.  Obviously, we talked about it a little bit earlier.  We did not make the objection for minor role or minimal role just for the reason that frankly I don't think we get there.  It's not quite -- it's not quite appropriate.

The looking at Section 3B1.2C in determining whether it applies subsection A or B one being minor the other being minimal or intermediate adjustment,

31

the Court should consider the following elements, a nonexistent and exhaustive list of factors, the first of degree in which the defendant understood the scope and structure of the criminal activity.

In this case, Mr. Desrosiers clearly understood the full scope of it.  Mr. Desir clearly didn't.  He was essentially being told we're going to run it again.  Mr. Desrosiers is the one who originally did all of the straw purchasing.  He's the one who had the contacts, and Mr. Desir has a smaller role.

Factor two, the degree in which the defendant participated in planning or organizing a criminal activity.  Once again, Mr. Desrosiers is the one who was doing all of the planning.

Number three, the degree in which the defendant exercised decision making authority or influenced the exercise of decision making authority.  Once again, Mr. Desrosiers is the one who is making all of the decision making authority.

Number four, this is the one where frankly we probably would have the issue trying to get this getting minor role.  The nature and extent of the defendant's participation in the commission of the criminal activity including the acts the defendant

32

performed and the responsibility and discretion the defendant had in performing those acts, and that's where I certainly think our argument under here is not -- with our argument to break down in that I suspect the Government would point out Mr. Desir did straw purchasing very similar to what Mr. Desrosiers did.

Mr. Desir as already discussed traveled with the guns at least one time up to Upstate New York someone close to the Canadian border, and so although his role might be not as significant as Mr. Desrosiers, are they some what comparable, and that's probably where we would have -- where this argument would have failed would be my guess.

And then the final one is the degree to which the defendant stood to -- in this case, Mr. Desrosiers is getting paid a substantial amount of money, thousands of dollars.  Mr. Desir was not.  So that's a significant difference as well.

And so Your Honor, I bring this up not because we think we successfully would receive minor role or certainly receive minimal role, but I bring it up for various purposes.  I think it is very relevant because Mr. Desir was not on the level of Mr. Desrosiers in this case.  Mr. Desrosiers set the whole thing up, he organized it, he was the mastermind, he

33

did all of the planning, and Mr. Desir was essentially his employee.

He drove up there with him, he told him to go straw purchase, he did that, and so Your Honor, we do think it's relevant for purposes of a variance to consider the roles of the two defendants. And that Mr. Desir, although he may not be like a mule, he did have a much -- a much lesser role in this case than Mr. Desrosiers, and so we raise it for variance purposes.

Your Honor, just touching really on our sentencing memorandum. We do believe in this case that a sentence of 30 months would be sufficient but not greater than necessary. We base that as we discussed in our memorandum Mr. Desir did have a difficult childhood. He moved around a lot, bounced between two countries, really never had stability in his life, and that has sort of played out through his adulthood. He has -- it should be noted these are from about two and a half, three years ago.

THE COURT: One of the things he has no other criminal conduct before; right? So I mean, you're going from driving with a suspended license in Miami-Dade in 2022 to now 46 months under the guidelines, right, so that's a pretty steep --

34

MR. SUMMERS:  That's true, and I think the Government will point out it's not completely true either just from the standpoint he does have the offense from Canada that does not score.  The guidelines specifically provide that it doesn't score.

THE COURT:  Uh-huh.

MR. SUMMERS:  But he did receive a year in jail on that offense.

THE COURT:  Okay.

MR. SUMMERS:  So he is a criminal history Category 1.  He has no U.S. convictions and the Court is correct, but I think it's also important and fair to note that he does have that Canadian offense.

THE COURT:  I do see that, yeah.  You're correct.

MR. SUMMERS:  And so I do want to -- I just want to clarify that.  But yes, Your Honor.  This is an individual who had a difficult childhood.  I do think that the two cases you can't ever fully compare cases but those two cases that DOJ has publicized on their website were those gentleman are getting 36 months, I think they're both much more culpable than Mr. Desir and involve more guns, more dangerous situations, and so in this case, we do believe that a sentence of 30 months would be sufficient to punish

35

him, sufficient to meet all the other factors for sentencing.

The other thing we would request, Your Honor, is Mr. Desir that he be able to take advantage of all drug and alcohol programs, really drug programs while in the Bureau of Prisons, all mental health -- whatever mental health things that he could take advantage of.  I know his cousin believes that he has depression.

We would ask that he be housed as close to home as possible, home being Fort Myers, Florida, and the other thing is 30 days for self surrender.  He has been on release for quite a while.  I'm not aware of any violations.  So that would be the last thing we asked for.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Eth?

MR. ETH:  Thank you, Your Honor.  Mr. Summers did give me this morning these two press releases, and again, he accurately said I don't know enough about the facts of these.  I haven't had time to look at them, so they are of minimal value to me.

I could only guess what the posture was in that case, exactly what the crimes of conviction were, the circumstances that the -- what the judge ruled in the PSR, whether there was cooperation.  So I'm not

36

sure they're terribly helpful to look at what sentence was received and try to compare it to Mr. Desir in this posture here, but I will note that it's not clear from either of these that the defendant getting sentenced had any role or knowledge or maybe even reason to believe that these guns would be exported from the United States.

And I'll mention the case from our district, this former police officer, it looks like according to press release he supplied firearms to somebody else who then smuggled those.  So the Court kind of compared Mr. -- what Your Honor would have felt that Mr. Desir drove the guns to Ocala and dropped them off versus drove them to the border.

We don't know that that's not the case here, and so you know without that knowledge, I'm left to believe that either of these cases involved a finding of guns being exported from the United States or leaving the United States, and evidently, the United States sentencing commission thinks that's a big deal because the sentencing commission thinks that a gun leaving the United States is part of your crime you should get four more levers, and so obviously that is a major difference here, and the reality is if those four levels wouldn't apply if Mr. Desir is looking at

37

sentences that came to the ones that these gentlemen got, assuming all other things be equal, there was no cooperation, et cetera, which I don't know about.  So I'll note that just for the record.

Mr. Summers also accurately said that Mr. Desir has a criminal conviction from Canada.  Again, I'm not privy to law enforcement or every law enforcement record or Canadian convictions, but I do know that there was a conviction for robbery that was in the PSR that was made available to us.  I can't tell the Court about the facts of the case, but evidently, it was severe enough that he was incarcerated and deported from Canada.

So Mr. Desir following his release from prison was deported from Canada back to the United States, and all things considered here, I do agree with Mr. Summers that Mr. Desir is the less culpable person here.  He came into the conspiracy later.  He purchased fewer firearms.

He was not in direct communication to my knowledge with the Canadian actors here, and so his role is less than Mr. Desrosiers, but I think that doesn't necessarily mitigate his conduct.  It just aggravates Mr. Desrosiers conduct frankly because I think he's going to have enhancement for having a

38

larger role than Mr. Desir; right?

So it's not the person who has a larger role gets a plus and the person with lesser role gets a minus.  It's the person who has substantially lesser role may get a minus but the average participate which Mr. Desir was doesn't get a plus or doesn't get a minus.

He just exists on the guidelines, and I think buying 12 guns and knowing where they're going this is not a guy who bought a gun.  Right?  It's a guy who bought one gun, two guns.  This is a guy who bought a dozen firearms knowing that they were going to be exported.  He's at least an average participant here.

And so understanding he's certainly less culpable than the person who recruited him into the conspiracy, I don't see him as so much less culpable that he's so much less than an average participant here.  I think that the guidelines are serious because the offense is serious and the sentencing commission feels that the characteristics are serious because of the recovery of firearms and the way the firearms are used, but I do believe that given how high those guidelines are for a person like Mr. Desir who granted he had a prior conviction in Canada years ago

39

evidently he's remained conviction free since at least he came into the United States in 2017.  So there certainly is something to be said about that.

And so given that and some of the other factors involved, I think a low end guideline sentence is fair and that's what the Government would advocate for, a sentence of 46 months.  I just don't see enough here where I can agree to a variance based on the conduct and some of the history.

THE COURT:  All right.  Mr. Desir, is there anything you would like the Court to hear before I impose sentence in this case?

THE DEFENDANT:  Yes.

(There was a pause in the proceeding.)

THE DEFENDANT:  All right.  So growing up my parents would like always tell me what kind of people to stay away from, so growing up, I always had discernment around who I keep myself around.  So any time that I did make a mistake, I never really made it again.  I don't think that I'm a person who has the traits of a repeatable offender.

I grew up playing football.  I am a 4X trainer.  I was working construction before this.  So I think that I'm the person in my family who thinks of generational wealth and I want to like be there for

40

them, and I know that I did make some terrible mistakes, and if I could take that back, I would have said no at that situation not realizing the repercussions of my actions, but with that, I want to say everything happens for a reason and take it to this and grow from my mistakes.

THE COURT: All right. Thank you, Mr. Desir. Anything further, Mr. Summers?

MR. SUMMERS: No, Your Honor. Thank you.

THE COURT: All right. Finally, Mr. Summers, is there any reason why I should not proceed with sentencing at this time?

MR. SUMMERS: No, Your Honor.

THE COURT: Okay. The Court having asked why judgment should not now be pronounced and after hearing responses, the Court finds no cause to the contrary, and having heard argument from counsel and from Mr. Desir, I must consider the relevant factors provided in 18 USC Section 3553(a) and ensure that I impose a sentence that is sufficient but not greater

41

than necessary to comply with the purposes of sentencing.

These purposes include the need for the sentence to promote respect for the law and to provide just punishment for the offenses. The sentence should also deter criminal conduct, protect the public and promote rehabilitation. In addition, I must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwanted sentencing disparities and the types of sentences available.

Now, upon consideration of the relevant factors in pursuant to 18 USC Sections 3551 and 3553, it is the judgment of the Court that the defendant be sentenced to a term of imprisonment of 46 months. This term consists of a 46-month as to Count 5, 9, 10, 11 and 14 all to run concurrently.

And then upon release from imprisonment, Mr. Desir shall serve a term of three years of supervised release. This term consists of three-year terms to Counts 5, 9, 10, 11 and 14 all of them to run concurrent. While on supervised release, Mr. Desir must comply with the mandatory standard conditions adopted by the Court in the Middle District which can be found in Sections 5D1.3A and C of the sentencing

42

guidelines.

In addition, Mr. Desir shall comply with the following additional special conditions. First is drug after care. Mr. Desir shall participate in a substance abuse program and follow the probation officer's instruction regarding the implementation of his directive. Further, Mr. Desir shall contribute to the cost of services not to exceed an amount determined reasonable by the probation office's sliding scale for substance abuse treatment services. During and upon completion of this program, you are to submit to random drug testing.

Second, Mr. Desir shall submit to a search of his person, residence, place of business and any storage units under his control or vehicle conducted by the United States Probation Office at a reasonable time and reasonable manner based upon reasonable suspicion of contraband or evidence of a violation of condition of release.

Mr. Desir shall inform any other residents at the premises that it is subject to a search condition. Failure to submit to a search may be grounds for revocation. Mr. Desir having been convicted of a qualifying felony must also cooperate with the collection of DNA as directed by probation

43

office.

Finally, as to mandatory drug testing, Mr. Desir must refrain from any unlawful use of controlled substance and must submit to one drug test within 15 days of placement on supervision and two periodic tests thereafter as directed by the probation office. He must not -- he must submit to random drug testing not to exceed 104 tests per year.

As for the fine component, based upon the financial status of Mr. Desir, the Court waives the imposition of a fine. However, there is a special assessment totaling $500 which shall be due immediately. Are there any forfeiture matters that need to be addressed in this case?

MR. ETH: No, Your Honor.

THE COURT: All right. After considering an advisory sentencing guidelines and all the factors identified in Title 18 USC Sections 3553, 1 through 7, the Court finds that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

Mr. Summers, I understood your arguments concerning the other cases that were provided to me, but I did note in this case that at least there is a significant enhancement based upon the guns being

44

transported outside of the United States.  So while I understand that there are some lower sentences that I could point to, I do think the guidelines in this case are appropriate considering the particular circumstances.  So that's why I went with this sentence at the end of the guidelines.  Two final issues.  First, was there any objection to the self surrender within 30 days, Mr. Eth?

MR. ETH:  No, Your Honor.

THE COURT:  All right.  So Mr. Desir, you are going to self surrender in 30 days which is on December 15th.  Does that date work on your end, Mr. Summers?  I believe that's a Monday.

(There was a discussion off the record.)

MR. SUMMERS:  Yeah, Your Honor.  Is there any chance that he could self surrender December 19th?

THE COURT:  Any objection to that, Mr. Eth?

MR. ETH:  No, Your Honor.

THE COURT:  Okay.  With no objection, the Court will go ahead and make that self surrender date December 19th.

MR. SUMMERS:  Thank you, Your Honor.

THE COURT:  All right.  The Court having pronounced sentence, does counsel for the defendant or the Government have any objections to the sentence of

45

the manner in which it was imposed; Mr. Summers?

MR. SUMMERS:  Your Honor, we have no objections except to the extent necessary to preserve our earlier objections.

THE COURT:  The objection of the guidelines enhancement, okay.  Mr. Eth?

MR. ETH:  No objection, Your Honor.

THE COURT:  Okay.  Finally then, Mr. Desir, you do have a right to appeal from the judgment of the sentence within 14 days from entry of the judgment. Failure to appeal during that period shall be a waiver of your right to appeal.  You are also advised that you are entitled to the assistance of counsel in taking an appeal, and if you are unable to afford a lawyer, one will be provided for you, and if you are unable to afford a filing fee, the clerk will be directed to accept your notice of appeal without such a filing fee.

I know Mr. Summers also requested accommodations regarding the Bureau of Prisons.  The Court will request that he be placed closest to his residence which is in Florida; correct, Mr. Desir?

THE DEFENDANT:  Yes.

THE COURT:  All right, and also that he be provided access to any programs that he's entitled to

46

while incarcerated.  Anything further, Mr. Summers?

MR. SUMMERS:  No, Your Honor.  Thank you.

THE COURT:  Mr. Eth?

MR. ETH:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Go ahead, Mr. Desir.  You can self report on December 19th, and we'll go ahead and call the next case.

THE CLERK:  Mr. Desir does need to go to the Marshals Office on the first floor.  They just have some paperwork for you to fill out.

THE COURT:  Okay.  Mr. Summers, did you hear that?

MR. SUMMERS:  Go downstairs to the Marshals.

THE COURT:  Yup.

MR. SUMMERS:  I did.  Thank you, Your Honor.

THE COURT:  All right.

PROBATION:  And pre-trial services, Your Honor.

THE COURT:  And pre-trial.

MR. SUMMERS:  And pre-trial.  Thank you, Your Honor.

(Proceeding concluded at 10:30 a.m.)

47

**CERTIFICATE OF COURT REPORTER**

I certify that this is a true and accurate record of proceedings in the United States District Court for the Middle District of Florida before the Honorable Kyle C. Dudek on November 14, 2025.


S/ Brandi A. Wilkins

Brandi A. Wilkins

Official Court Reporter